UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF PUERTO RICO

| | |
|---|---|
| YAZMIN MORALES PEÑA<br><br>Plaintiff<br><br>vs.<br><br>HOSPITAL SANTA ROSA, INC.; CLINICA SANTA ROSA INC.; DR: LUIS RIVERA POMALES AND THE CONJUGAL PARTNERSHIP CONSTITUTED WITH HIS WIFE JANE DOE; DR: JUAN AULET MORALES AND THE CONJUGAL PARTNERSHIP CONSTITUTED WITH HIS WIFE JANE DOE; DR. PABLO J. DE CASTRO CARLO AND THE CONJUGAL PARTNERSHIP CONSTITUTED WITH HIS WIFE JANE DOE; DR. LUIS MELENDEZ GOMEZ AND THE CONJUGAL PARTNERSHIP CONSTITUTED WITH HIS WIFE JANE DOE; DR. FERNANDO L. MATEO ENOMOTO AND THE CONJUGAL PARTNERSHIP CONSTITUTED WITH HIS WIFE JANE DOE; RADIOLOGY SUPPORTING SERVICES; CONTINENTAL INSURANCE COMPANY; SINDICATO DE ASEGURADORES PARA LA SUSCRIPCION CONJUNTA DE SEGUROS DE RESPONSABILIDAD PROFESIONAL MEDICO-HOSPITALARIA (SIMED); INSURANCE COMPANIES A, B, C, D, E, F & G; CORPORATIONS A & B; JOHN DOE & RICHARD ROE<br><br>Defendants | CIVIL NO.<br><br><br>PLAINTIFF DEMANDS TRIAL BY JURY |

# COMPLAINT

**TO THE HONORABLE COURT:**

Complaint                                                                                                                           Page 2

**COMES NOW** plaintiff, **Yazmin Morales Peña**, through the undersigned counsel and respectfully states, alleges and prays as follows:

### I. JURISDICTION & VENUE

1. This Honorable Court has jurisdiction over this civil action pursuant to 28 U.S.C., §1332, where the matter in controversy exceeds the sum or value of seventy-five thousand dollars **($75,000.00)**, exclusive of interests and costs, and it is between citizens and entities of different States.

2. The facts set forth in this complaint are actionable under Articles 1802 and 1803 of the Civil Court of Puerto Rico, 31 L.P.R.A., §§5141 and 5142.

3. Venue is proper pursuant to 28 U.S.C., §1391.

4. Plaintiff demands a trial by jury.

### II. PARTIES

5. Plaintiff **Yazmin Morales Peña** is of legal age and currently resides at 809 W. King St., First Floor York, PA 17401. She is the daughter of Migdalia Peña Morales, who passed away on October 30, 2013.

6. Defendant **Hospital Santa Rosa, Inc**. is a private entity that offers medical services with facilities at Veterans Avenue, Road # 3, Guayama, Puerto Rico.

Complaint                                                                                                         Page 3

7. Defendant **Clínica Santa Rosa, Inc.** is a private entity duly registered in the Department of State of the Commonwealth of Puerto Rico with registration number 3241. Said defendant is the owner and/or in charge of operations and/or management of Hospital Santa Rosa, located at the address stated in the preceding paragraph.

8. Defendant **Dr. Luis Rivera Pomales** is of legal age, married, physician, and at all times relevant herein, was an employee or independent contractor of Hospital Santa Rosa, Inc. and/or Clínica Santa Rosa, Inc. At the present time, Dr. Rivera Pomales has offices at Ashford Norte St., # 62, Guayama, Puerto Rico.

9. Defendant **Dr. Juan Aulet Morales** is of legal age, married, physician and at all times relevant herein, was an employee or independent contractor of Hospital Santa Rosa, Inc. and/or Clínica Santa Rosa, Inc. At the present time, Dr. Aulet Morales has offices at Cristo St., #14, Patillas, Puerto Rico.

10. Defendant **Dr. Luis Meléndez Gómez** is of legal age, married, physician and at all times relevant herein, was an employee or Independent contractor of Hospital Santa Rosa, Inc. and/ or Clínica Santa Rosa, Inc. At the present time, Dr. Meléndez Gómez has offices at Sol St., # 7, Arroyo, Puerto Rico.

11. Defendant **Dr. Pablo J. De Castro Carlo** is of legal age, married, physician and at all times relevant herein, was an employee or

**Complaint**                                                                                                          Page 4

independent contractor of Hospital Santa Rosa Inc. and/or Clínica Santa Rosa, Inc.

12. Defendant **Radiology Supporting Services** is a private entity with offices at 16 Triboli St., San Juan, PR 00926, which, at all times relevant herein, provided services to defendant Hospital Santa Rosa, Inc.

13. Defendant **Dr. Fernando L. Mateo Enomoto** is of legal age, married, physician, and at all times relevant herein, was an employee or independent contractor of Radiology Supporting Services and worked at the facilities of Hospital Santa Rosa.

14. Defendant **"Jane Doe"** is the fictitious name use for defendants' wives, whose identities are presently unknown.

15. Defendant **Continental Insurance Company** is a private entity dedicated to the insurance business with offices at 40 Wall Street, NY, NY 10005, and at all times relevant herein, had an insurance policy issued on behalf of defendant Hospital Santa Rosa, Inc. covering the risks herein alleged.

16. Defendant **SIMED** is a private entity dedicate to the insurance business with offices at Centro Europa Bldg., Suite 501, 1492 Ponce De Leon Ave., Santurce, PR 00907-4117, and at all times relevant herein, had an insurance policy issued on behalf of Dr. Fernando L. Mateo Enomoto covering the risks herein alleged.

Complaint                                                                                                       Page 5

17.   Defendant **Admiral Insurance Company** is a private entity dedicated to the insurance business with offices at Plaza Olmedo, Rio Piedras, PR 00925, and at all times relevant herein, had an insurance policy issued on behalf of Radiology Supporting Services covering the risks herein alleged.

18.   Insurance Companies A, B, C, D, E, F & G are private entities whose true identities are presently unknown, that at all times relevant herein, had issued policies for some or all defendants mentioned above and thus, are liable for their negligent acts or omissions.

19.   Corporations A & B are fictitious names for corporations whose true identity are presently unknown, that at all times relevant herein, were in charge of the personnel working at Hospital Santa Rosa, Inc. and/or Clínica Santa Rosa, Inc.

20.   John Doe and Richard Roe are fictitious names for any other physician or entity that participated in the treatment and/or diagnosis of Migdalia Peña Morales while she was a patient at the Hospital Santa Rosa, Inc. and/or Cíinica Santa Rosa, Inc., and that incurred in negligent acts and/or omissions that led to her death.

### III. FACTS

21.   On September 16th, 2013, at 7:23 PM, Mrs. Migdalia Peña-Morales went to Santa Rosa Hospital's emergency department.  She was received and assisted by the Triage nurse, who obtained and recorded the

**Complaint** Page 6

vital signs BP 113/88, P 74, R 20, and T 36.9.  The chief complaint was vomiting, nauseas, dizziness, and diarrhea.

22. At 10:30 p.m. she was evaluated by the emergency physician, Dr. Juan Aulet-Morales, who obtained the past medical history of diabetes mellitus and the chief complaint as six (6) episodes of vomiting of two (2) days evolution and soft stools.  He performed a physical examination and his impression diagnosis was acute gastroenteritis.

23. The medical orders were:  CBC, BMP, U/A, lipases, 0.9& NSS, Pepsid®, Kaopectate®, and Phernergan®.

24. On September 17th, 2013 at 1:23 a.m., the emergency physician, who followed Dr. Aulet, Dr. Pablo J. De Castro, prescribed a set of medical orders, which included: bed rest, regular insulin 16 units/IV, capillary glucose in one hour, 0.9% NSS at an infusion rate of 100 ml/hour, U/A Ativan® 2 mg IV, and consulted the internal medicine service, Dr. Luis A. Rivera-Pomales, because of uncontrolled diabetes mellitus and acute renal failure.

25. At 6:10 a.m. Dr. De Castro ordered 250 ml of NSS at maximum speed, then at an infusion rate of 150 ml/hour, a capillary glucose test, CBC, BMP (these last two tests, required by Dr. Rivera-Pomales) and emphasized on the internist consultation.

26. When Dr. De Castro left his shift, he wrote on the medical record that the patient was consulted to the internist, who would follow-up

and do final disposition. The final diagnoses were dehydration and acute renal failure.

27. On September 17, 2013, at around 10:30 a.m., Mr. José Manuel Laboy Padilla assisted Mrs. Migdalia Peña Morales in going to the bathroom, located in the Emergency Room of Hospital Santa Rosa. Mrs. Peña Morales had remained in the emergency room since she was admitted to the facility.

28. Once inside, Mrs. Migdalia Peña fell to the floor, injuring the left side of her body.

29. She was assisted by the hospital's personnel and an accident report was filled out, although copy was never provided to Mrs. Peña.

30. The incident was reported to Dr. Luis Rivera Pomales and x-rays were ordered, which resulted were allegedly negative for shoulder and ribs fractures.

31. Upon being discharged from the hospital, the glucose level was 127 mg/dL, the test for influenza was negative; she had improved with hydration and food ingestion. Dr. Rivera- Pomales recorded the results of the U/A as suggestive of urinary tract infection and ordered antibiotics Bactrim DS, famotidine, Lasix, urine culture and follow-up with a nephrologist in two (2) days and her primary physician.

32. At 11:25 a.m., the respiratory therapist indicated that by the time he was obtaining the blood sample for the blood gases test, the

patient was lethargic. He also recorded that she had rhoncus (broncospasm) on pulmonary auscultation.

33. The results of the MBP initially ordered by Dr. Aulet, reported at 12:20 AM were: glucose 484 mg/dL (NV 65/110 mg/dL) BUN 43 mg/dL (NV 7-17 mg/dL), creatinine 4.06 mg/dL (NV 0.50-1.00 mg/dL), sodium 125 mg/dL (NV 137-145 mg/dL), potassium 3.5 mg/dL (NV 3.6-5.00 mg/dL), chloride 77 mg/dL (NV 98-107 mg/dL) and serum acetone negative.

34. The BMP results ordered by Dr. Castro upon request by Dr. Rivera-Pomales, reported at 6:46 AM were: glucose 135 mg/dL, sodium 130 mg/dL, potassium 2.9 mg/dL, and chloride 85 mg/dL.

35. **On September 20th, 2013** at 10:10 a.m., Mrs. Peña returned to the same hospital's emergency department. She was received and assisted by the Triage nurse, who recorded the vital signs and the rest of the initial intervention elements.

36. On the chief complaint section, she recorded pain to the left arm and that she had suffered a fall the previous Tuesday while in the hospital. The pain was estimated as minimal and localized on the left arm.

37. At 10:45 a.m., she was evaluated by the emergency physician, Dr. Luis Meléndez-Gómez, who obtained a history of a 44 year old feminine, who came to emergency department as she suffered trauma to

**Complaint**                                                                                                           Page 9

the left shoulder on Tuesday and was complaining of pain and limited motion of the left shoulder.

38. On the pertinent physical examination, she had pain and limitation of motion of the left shoulder, without edema or cyanosis of the extremity. According to the physician, the axillar, brachial, radial, and ulnar pulses were present and strong, even proximal and distal. He ordered radiography of the left shoulder and analgesics.

39. The antero-posterior projection of the radiograph, showed a slight impacted fracture of the surgical neck of the left humerus. A sling was applied and was oriented to obtain a referral form, to be followed by an orthopedic surgeon as soon as possible. Analgesics were prescribed and she was discharged home at 3:50 PM.

40. On **September 25th, 2013** at 3:30 p.m., Mrs. Peña was evaluated at the orthopedic surgeon's office Dr. Rafael López-Hernández. The history of the illness was a fall at the Santa Rosa Hospital's emergency department on September 17th, 2013 and a diagnosis of a fracture of the proximal third of the left humerus, without displacement; a sling was applied.

41. At the physical examination with Dr. López, she presented pain and weakness of the left shoulder as well as disability to move the fingers of that extremity. The extremity was cold and the distal pulses were not present.

42. The impression diagnosis was arterial thrombosis and she was referred immediately to the emergency department, to perform a vascular study. She was received and assisted at the Cristo Redentor Hospital's emergency department in Guayama, where besides doing the vascular study, she was treated for severe decompensation of her diabetes, reaching 607 mg/dL of glucose levels.

43. Her BUN and creatinine levels improved compared to the results dated September 17th, 2013, although she continued with some electrolyte impairment.

44. A vascular arterial and venous ultrasound image test was done on the left upper extremity, which resulted in a non-calcified mural thrombus, at the axillar artery joint with the brachial artery on the left side, with stenosis approximately 90% and decreased arterial flow in the ulnar and brachial arteries. Vascular flow was not detected in the proximal aspect of the ulnar, either radial left arteries. She was referred and transferred to the Puerto Rico Medical Center.

45. At 11:00 p.m., she was received at the Medical Center's emergency department and was evaluated by the emergency physician, Dr. Hilda Quiñones, who recorded the physical examination of the left upper extremity as numbness and decreased sensation, without patent pulses, and the hand was cyanotic, with very poor response and muscular tone.

46. She ordered a left shoulder radiograph which was interpreted as negative while the computed tomography with intravenous contrast ordered simultaneously, resulted in thrombosis of the left brachial artery and comminute, displaced fractures of the anatomical and surgical neck of the left humerus, extending to both tuberosities (greater and lesser) of the left humerus. Trauma and orthopedic surgery services were consulted.

47. The specialist agreed with the aforementioned diagnoses but consulted internal medicine service because of the uncontrolled glucose and numerous co morbidities of the patient.

48. On September 26th, 2013, Mrs. Peña was intervened by both surgeons. The orthopedic surgeon did not find any indications for orthopedic management. The trauma surgeon performed a trans humeral amputation and thrombectomy because the advance arterial insufficiency of the extremity (stage III Rutherford classification or claudication).

49. The pathologic report indicated the skin of the amputated specimen had ulceration, ischemia and necrosis. The thrombus removal from the left brachial artery was also submitted.

50. The patient was transferred to the Trauma Hospital, intermediate unit, where she developed severe hematuria, with increase in creatinphosphokinase and myoglobin levels by September 30th, 2013.

51. On October 1st, 2013, new complications developed, like complicated urinary tract infection, uncontrolled diabetes and cellulitis at

the amputation stump. The corresponding cultures were ordered and done, as well as administration of intravenous antibiotics and sub specialists were consulted. These events required transfer to the intensive care unit to close follow-up the complications.

52.  Mrs. Peña suffered respiratory complications, which absolutely indicated endotracheal intubation and mechanical ventilation. By October 28th, 2013 acute renal failure and nephrotic syndrome raised. Dialysis was attempted, but her critical condition prevented it.

53.  This complicated even more her hemodynamic state, with hypotension and subsequently had a cardiovascular collapse and cardiac arrest, which did not respond to the advance cardio pulmonary resuscitation measures. She was pronounced dead on October 30th, 2013 at 4:36 p.m.

## III DAMAGES

54.  As a result of the fall suffered by Mrs. Migdalia Peña Morales on September 17, 2103, she sustained a fracture to her left shoulder that remained undetected until September 20, 2013. Said injury worsen her physical condition to the extent that on September 25, 2013, Mrs. Peña Morales presented an arterial thrombosis, with stenosis approximately 90% and decreased arterial flow in the ulnar and brachial arteries.

55.  The deceased was transferred to the Puerto Rico Medical Center, at which time she was manifesting numbness, decreased

sensation, without patent pulse, cyanotic hand, with poor response and muscular tone.

56. On September 26, 2013, Mrs. Peña Morales was submitted to a trans humeral amputation and thrombectomy because of the advanced arterial insufficiency of the extremity. She remained hospitalized with severe complications until her death on October 30, 2013.

57. Plaintiff Yazmin Morales Peña, daughter of deceased Migdalia Peña Morales, suffered intense mental anguishes and emotional pain throughout the aforementioned process and continues to suffer the loss of her mother, with whom she had a very close relationship.

58. Plaintiff Yazmin Morales Peña's mental anguishes and emotional pain are valued in the amount of **$700,000.00**.

## IV. NEGLIGENCE

59. The fall suffered by deceased Migdalia Peña Morales at Hospital Santa Rosa' emergency room and its consequential damages, such as the fracture to her left shoulder; amputation of said extremity; her mental anguishes and eventual death, were caused by the negligence of defendants Hospital Santa Rosa Inc. and/or Clinica Santa Rosa, Inc.; Dr. Luis Rivera Pomales; Dr. Juan Aulet Morales; Dr. Pablo J. De Castro Carlo; Dr. Luis Meléndez Gómez; Dr. Fernando L. Mateo Enomoto; and Radiology Supporting Services.

Complaint                                                                                                    Page 14

60.  Hospital Santa Rosa, Inc; Clinica Santa Rosa, Inc.; Dr. Rivera Pomales; Dr. Aulet Morales and Dr. De Castro Carlo were negligent due to their failure to take proper measures in order to prevent Mrs. Migdalia Peña Morales from getting up from her assigned bed without the specialized assistance of the hospital's personnel. During her initial evaluation, it was evident that Mrs. Peña Morales was visibly weak due to dehydration.  At that time, the abovementioned physicians as well as the hospital's personnel had a duty to enforce a fall prevention plan for Mrs. Peña Morales. In failing to do so, they deviated from the best practice of medicine.

61.  Additionally, Dr. Rivera Pomales was negligent by failing to take a detailed history of the deceased's fall on September 17th which prevented him from selecting a better diagnostic test to evaluate the injury to the left shoulder. The magnitude of the fall was such that the hospital's personnel came to assist Mrs. Peña Morales; thus, the situation warranted a better diagnostic method than the one ordered by Dr. Rivera Pomales.

62.  Dr. Melendez Gómez was negligent also by selecting a lesser radiologic resolution image study on September 20, 2013.  The study ordered by Dr. Melendez Gomez revealed a minimally impacted fracture of the surgical neck of the humerus, when in fact she had a comminute,

displaced fracture, at the neck of the humerus and extended to both tuberosities.

63. Defendant Dr. Fernando L. Mateo Enomoto, was negligent by misinterpreting the X-rays images on September 17th and thus concluding that Mrs. Peña had no fracture in her left shoulder when in fact she had such an injury in said extremity and then in September 20th, when he reached a finding of *"mildly impacted fracture"*, when in fact it was a comminute, displaced fracture.

64. Defendant Radiology Supporting Services is directly liable to the plaintiff for the negligent acts or omissions of Dr. Fernando L. Mateo Enomoto, who was its employee or independent contractor.

65. Finally, Dr. Rivera Pomales and Hospital Santa Rosa, Inc./Clinica Santa Rosa, Inc. were negligent by discharging Mrs. Peña Morales before full administration of the prescribed volume of intravenous fluids and before obtaining the blood sample for the BMP test, which contributed to her uncontrolled glucose and diabetes.

66. On **September 15th, 2014**, plaintiff herein filed a Complaint based on the same facts before the Superior Court of Guayama, Commonwealth of Puerto Rico, under civil num. GDP2014-0110. The case was dismissed **without prejudice** on January 30, 2015, thus, the instant lawsuit is not time barred.

**Complaint** Page 16

**WHEREFORE,** plaintiff respectfully requests from this Honorable Court that the instant Complaint be granted, plus the award of costs, pre-judgment interest and attorney's fees.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, this 15th day of September, 2015.

        *S*/Vicente Santori Margarida
        **VICENTE SANTORI MARGARIDA**
        USDC-PR NO. 205913
        PO BOX 9024098
        SAN JUAN, PR 00902-4098
        TEL.: 787-724-8103
        FAX: 787-724-8152
        E-mail: v.santori@ploolaw.com